## Continental Bank v. Lara Pozo et al.

*Leonard B. Edelstein*, for plaintiff.
*Howard N. Snitow*, for defendant.
*Janet M. Cantwell*, for petitioner.

KALISH, *J.*, April 10, 1975—In the spring of 1972, Mr. Lewis Kates, a partner in the firm of Kates, Livesey and Edelstein, was retained by Mr. Samuel Pitt, who, along with Mr. Gerard Cantwell, the now estranged husband of Mrs. Cantwell (hereinafter known as petitioner), and Mr. Jose Manuel Lara Pozo, was interested in forming a corporation for the purpose of engaging in an import-export business in Ecuador. Mr. Kates not only incorporated the business, which was called CLP Corporation but, as CLP's legal counsel, was instrumental in setting up loan negotiations with Mr. Richard Lindsey, Vice-President of Continental Bank due to his being well known to the bank because of his previous dealings with it. Mr. Kates was present, as legal counsel for CLP, at the various meetings with Mr. Lindsey. The bank agreed to advance the loan on the personal guarantee of each

of the principals and their respective wives. On July 10, 1972, petitioner, along with five other persons, signed an unlimited surety agreement and guaranty as consideration for a $50,000 loan from Continental to CLP to finance the export operation. The corporate note evidencing the loan was signed by Mr. Cantwell, Mr. Pitt and Mr. Lara Pozo in their official capacities and in the presence of a bank official. Following the loan transaction, an agreement was reached between Mr. Kates and CLP whereby Mr. Kates would receive stock in CLP and be made a "partner" as compensation for his legal services as "house counsel." Mr. Kates received an interest in the corporation before the summer ended, a fact known to Mr. Lindsey.

In the fall of 1972, CLP ceased doing business in Ecuador. Mr. Kates continued to provide legal services to CLP and it was with him, as well as other members of his firm, that Mr. Lindsey periodically spoke to obtain financial information to determine CLP's ability to make payment on the loan. Mr. Lindsey sent a demand letter on July 13, 1973, to the corporation, petitioner and the other sureties which threatened legal action if payments on the outstanding loan were not forthcoming. In response, the bank received two letters from Howard Snitow, Esquire, informing the bank of his intent to represent petitioner and to open any judgment which might be entered against her and asserting that she had no knowledge of having signed the surety agreement. Continental contacted Mr. Kates concerning legal action on behalf of the bank to collect the debt. It was subsequently arranged that the firm of Kates, Livesey & Edelstein would proceed against some, but not all of the sureties. No action was to be taken against Mr. and Mrs. Pitt, as

the bank had agreed not to pursue them in exchange for Mr. Pitt's portion of the loan and his assumption of the costs of prosecuting executions against the other parties. Mr. Kates referred the case to his partner, Leonard Edelstein, Esquire, instead of handling it himself. Mr. Edelstein entered judgment against petitioner on January 24, 1974. Following her receipt of notice of entry of judgment, petitioner called Mr. Edelstein, who informed her that the firm represented the bank, not her, that it would seek to execute against her home and that she should retain an attorney to represent her interests. On February 10, 1974, Mr. Snitow contacted Mr. Edelstein to open judgment. In late April, Mr. Kates terminated his association with the firm and turned over all his files to the other members of the firm. On May 14, 1974, Mr. Edelstein filed the writ of execution against petitioner's residence. Petitioner subsequently filed the instant petition to open judgment. We have heard oral argument on the matter and have before us the petition and amended petition to open judgment, plaintiff bank's answers thereto and depositions.

A petition to open a judgment by confession is an appeal to the equitable powers of the court, governed by equitable principles: Bucks County Bank and Trust Company v. DeGroot, 226 Pa. Superior Ct. 419, 313 A. 2d 357 (1973); G.A.C. Credit Corporation v. Acme Accordion Studios, Inc., 220 Pa. Superior Ct. 148, 286 A. 2d 678 (1971). Equitable considerations should convince the court that justice would best be served by opening the judgment: Emperee v. Meyers, 440 Pa. 430, 269 A. 2d 731 (1970); Carrier v. William Penn Broadcasting Company, 426 Pa. 427, 233 A. 2d 519 (1967).

Petitioner asserts that the circumstances of the

judgment by confession present a case of conflict of interest of counsel which has so adversely affected her rights that it is an overriding equitable consideration and that relief must be granted.[1]

On the other hand, the bank contends: (1) neither Mr. Kates nor any member of his firm ever represented petitioner as an individual, thus circumventing the ethical problem; (2) Mr. Snitow, by letter, prior to entry of judgment, showed an interest in representing petitioner; and (3) the distinction between representation of an individual and representation of a corporation shows a lack of conflict.

Petitioner's husband could not get the loan except for the signature of petitioner as surety and especially since the home which is the subject of the execution was owned by both.

Counsel knew this when he represented her husband. The relationship of husband and wife is so interwoven with the ownership of real estate by each or both that to now permit counsel, as a representative of the bank, to proceed against the wife, strikes the conscience of the court.

CLP Corporation is not a large corporation with a formalized bureaucratic structure but a small uncomplicated business operation consisting of the three principals of whom petitioner's husband was one and with whom Kates was associated in both legal and business capacities. Under the circumstances of this case, the corporate curtain should be lifted. Moreover, the record fails to indicate that Mr. Kates or any other member of the firm made any effort to disclose to petitioner or any of the other defendants either its intent to represent the

---

1. See Appendix, for Code of Professional Responsibility.

bank in its attempt to collect from them, let alone of any possible adverse consequences arising from its representation of the bank.

In fact, Mr. Edelstein had to inform petitioner when she called after receiving the notice of the entry of the judgment that his firm did not represent her and that she should get a lawyer. As a partner in the firm which purportedly represented CLP Corporation, Mr. Edelstein is subject to the same standards of conduct as his partner.

"The relations of partners in a law firm are so close that the firm, and all the members thereof, are barred from accepting any employment that any one member of the firm is prohibited from taking.": American Bar Association Formal Opinion 33, p. 277 (1931).

Even if CLP is no longer a client or was not at the time the firm agreed to represent plaintiff, the duty not to represent conflicting interests is still applicable, since the obligation of undivided loyalty extends to former as well as current clients.

The law firm's conduct also raises the possibility of Mr. Edelstein using the information derived from disclosures made to Mr. Kates by the principals of CLP to the detriment of Mrs. Cantwell. In order to protect attorney-client communications, courts have generally disqualified attorneys whenever the subject matter of the subsequent representation is so closely related to that of the earlier representation that confidences *might* be involved: American Bar Association Informal Opinion 1233, p. 3 (1972).

Furthermore, disclosures made to counsel when Mr. Pitt and his wife were released as sureties may affect petitioner's rights and obligations as a surety.

Petitioner's ability to prove a meritorious defense to the underlying transaction and grounds for attacking the judgment itself, two traditional prerequisites for opening a judgment, have been impaired. It has also been a factor contributing to petitioner's failure to respond promptly to entry of judgment against her. Under the circumstances of this case, it would be grossly unjust to permit this judgment by confession to remain. Consequently, the court enters the following

## ORDER

And now, April 10, 1975, after argument, consideration of the briefs and depositions, judgment against Janet M. Cantwell is hereby opened.

## APPENDIX

The Code of Professional Responsibility adopted by the American Bar Association on August 12, 1969 and amended February 12, 1970, is the standard of conduct for all Pennsylvania Courts: Pa. R.C.P. 205. Canon 5 of the code, in its section on ethical considerations provides, in relevant part:

"EC 5-14 Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant.

"EC 5-15 A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be jus-

tified in representing in litigation multiple clients with potentially differing interests."

The associated disciplinary rules provide, in relevant part:

"DR 5-105 Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

"(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5-105, no partner or associate of his or his firm may accept or continue such employment."

Canon 5 is largely an elaboration and enlargement of canon 6, "Adverse Influences and Conflicting Interests" of the American Bar Association Canons

of Professional Ethics,[2] the predecessor of the Code of Professional Responsibility, as well as an incorporation of numerous American Bar Association formal and informal opinions on conflict of interest and related issues.

2. Canon 6 reads as follows:

"It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, any interest in or connection with the controversy, which might influence the client in the selection of counsel.

"It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

"The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."